Charles **SMITH**, Carol P. Zippert, Raymond Austin, Veselle Jackson, Walter Jackson, Carrie Fulghum, Marshal Beasley, Prince Arnold, and Rev. Matthew Barber, on Behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

v.

Edwin W. **MEESE**, III, Attorney General of the United States; William Bradford Reynolds, Acting Associate Attorney General; Stephen S. Trott, Assistant Attorney General; John C. Bell, U.S. Attorney for the Middle District of Alabama; Frank W. Donaldson, U.S. Attorney for the Northern District of Alabama; Jeff B. Sessions, III, U.S. Attorney for the Southern District of Alabama, Defendants-Appellees.

No. 85–7625.

United States Court of Appeals, Eleventh Circuit.

June 30, 1987.

Neil Bradley, Laughlin McDonald, Atlanta, Ga., Ira A. Burnim, Children's Defense Fund, Washington, D.C., for plaintiffs-appellants.

William Kanter, Appellate Staff, Civil Division, Michael Jay Singer, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before KRAVITCH and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

CLARK, Circuit Judge:

The plaintiff-appellants in this case are nine black voters and elected officials who allege that the defendant-appellees, the Attorney General of the United States and other Department of Justice officials, "are engaged in a concerted and unlawful effort both to interfere with black citizens' associational and political activities in Alabama's 'Black Belt' and to discourage them from exercising their right to vote, in violation of the First, Fifth, and Fifteenth Amendments to the U.S. Constitution and in violation of 42 U.S.C. §§ 1983 and 1985(3)." Appellants' Brief at 2. The district court dismissed the case, brought as a class action, on the ground that the separation of pow-

ers doctrine precludes federal court review of the defendants' actions in this case, and on the further ground that the plaintiffs lack sufficient standing to maintain this action. *Smith v. Meese,* 617 F.Supp. 658 (M.D.Ala.1985). Because we disagree with the district court on the separation of powers issue, and we think the court misinterpreted the plaintiffs' complaint in reviewing the standing question, we reverse the judgment of the court below and remand the case for further proceedings in accordance with this opinion.

## I. HISTORY OF THE CASE

### A. *Facts as Alleged in the Complaint*

Because this action was dismissed for want of jurisdiction and for lack of standing, we construe the complaint most favorably to the plaintiffs and take all allegations in the complaint as true. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Cummings v. United States,* 648 F.2d 289, 291 (5th Cir. Unit A June 1981). The following recitation of allegations is taken solely from the plaintiffs' complaint. Because the complaint was dismissed at an early stage, there is no evidence in the record on appeal to support or refute the allegations.

The plaintiffs' complaint alleges that in recent years many white citizens and local officials in Alabama's "Black Belt" have attempted to deny black voters equal access to the political process and to impair the ability of blacks to elect candidates of their choice. Specifically, the plaintiffs allege that this unlawful conduct includes, among other things, withholding absentee ballots from black voters, assisting in the casting of unlawful absentee ballots by white voters, intimidating black voters on and before election days, buying votes, multiple voting, and tampering with voting machines.

According to the plaintiffs, this conduct violates federal criminal law. Black citizens have for years complained to federal officials, including certain of the named defendants, about this voting fraud and intimidation. This conduct, of which the

defendants are aware, has denied black citizens equal access to the political process and has impaired their ability to elect candidates of their choice. According to the complaint, the defendants have deliberately failed to investigate this criminal conduct.

The complaint further alleges that in recent years black voters in the "Black Belt" counties of Greene, Lowndes, Perry, Sumter, and Wilcox have begun to have some success in electing minority candidates to local and state offices. In this area of Alabama, according to the complaint, there has been substantial white resistance to the electoral gains made by blacks. The plaintiffs allege that whites in the "Black Belt" vote mainly for the. Republican Party, which is the party currently in control of the Department of Justice and the defendants in general. On the other hand, the blacks in the area have tended to support the Democratic Party in elections.

Although the defendants, according to the complaint, failed to investigate white voting fraud in the area, in 1984 the defendants initiated major investigations of black political leaders and activists who the defendants alleged committed various election crimes. These alleged crimes, according to the plaintiffs, are no different than the crimes by local whites that the defendants have for years ignored. The plaintiffs allege that the defendants have deliberately pursued a discriminatory policy of investigating electoral fraud by blacks while ignoring the same type of conduct by whites.

The complaint asserts that the defendants have deliberately focused their investigations on well-known black leaders who are in large part responsible for a dramatic increase in the number of black registered voters in the area. These leaders are associated with organizations that have assisted in efforts to elect candidates concerned with the needs of the black community. These organizations have opposed candidates who are not sympathetic to the concerns of the local blacks.

According to the complaint, the investigations of black activists which began in 1984 coincided with and resulted from a change in the Justice Department's policies toward election crimes. Prior to 1984, the Justice Department allegedly focused investigations almost exclusively on crimes that affected the integrity of federal elections. Before 1984, the Justice Department did not investigate essentially "local" election fraud that was unlikely to influence federal elections. The plaintiffs allege that the election crimes with which black leaders have been charged are "local" in nature, affecting only local offices and involving very small numbers of votes.

According to the complaint, this shift in focus toward local election crimes coincided with the policy change announced by the Justice Department in mid–1984. Under the new policy, federal officials would investigate "political participants" who "seek out the elderly, socially disadvantaged, or the illiterate, for the purpose of subjugating their electoral will." In implementing this new policy, the plaintiffs allege that the defendants explicitly used racial criteria in targeting areas to investigate. According to the plaintiffs, the defendants have investigated *only* black civil rights leaders under the new policy. The complaint alleges that in selecting counties in which to initiate investigations, the Department of Justice placed a high priority on counties in which whites have made complaints in the face of a black majority in the population.

The complaint alleges that the defendants intended the references in the new policy to "poor, elderly, and socially disadvantaged voters" to mean black voters. The effect of the defendants' actions is to perpetuate the effects of prior unlawful discrimination.

According to the plaintiffs, the investigations in the local area were instigated pursuant to the new policy. The plaintiffs allege that the defendants intentionally caused or permitted the investigations to be conducted in a manner that improperly interferes with the associational and political activities of black citizens in the area. The investigations are calculated to discourage poor, elderly, and socially disadvantaged blacks from exercising their right to vote. The plaintiffs assert that the de-

fendants are acting in concert with state officials to deny the plaintiffs their rights.

In the course of these investigations in the "Black Belt," according to the allegations, federal agents have knowingly conducted "witchhunt-type" probes of constitutionally protected behavior. The agents have intensively and abusively interrogated poor, elderly, and socially disadvantaged black voters concerning political organizations of which the voters are members. The agents have suggested to black voters that the voters' constitutionally protected activities somehow amount to violations of federal and local criminal law. The federal agents have misinformed black voters about the voters' eligibility to cast absentee ballots. The agents have warned the black voters not to discuss the agents' questions with attorneys for black leaders under criminal investigation. According to the complaint, the defendants do not expect the investigations to lead to strong cases against the black leaders and activists.

The complaint alleges that the investigations started prior to the September, 1984 primary, and became notorious before the 1984 general election. The complaint asserts that the investigations caused a decline in black voting in the 1984 general election. According to the complaint, the purpose of the investigations is to interfere with the associational and political activities of black citizens, and to discourage black voters from voting. The plaintiffs allege that the defendants intend to encourage white voters to continue to support Republican Party candidates, and to punish black voters in the "Black Belt" for supporting Democratic Party candidates.

Based on these allegations, which this court on appeal must take as true, the plaintiffs' claim in their complaint that the defendants have deprived the plaintiffs, and the class they hope to represent, of due process, equal protection, and their First and Fifteenth Amendment rights. The complaint asks that the district court enjoin the discriminatory policies and to require that the defendants initiate investigations in a nondiscriminatory manner. The plaintiffs also seek costs and attorneys' fees.

## B. *Course of Proceedings Below and on Appeal*

On June 11, 1985, in the United States District Court for the Middle District of Alabama, the plaintiffs filed their complaint, making the above detailed allegation and seeking declaratory and injunctive relief. As indicated in their original complaint, the plaintiffs sought to bring their action on behalf of themselves and "a class of all black registered voters in Greene, Lowndes, Perry, Sumter and Wilcox Counties." Complaint at 5.

On July 19, 1985, the defendants filed a motion to dismiss the action, arguing that the federal courts lacked jurisdiction over the plaintiffs' claims and that the plaintiffs lacked standing to raise the claims. The district court set a hearing for August 15. The hearing was cancelled or postponed, apparently at the plaintiffs' request. Instead of rescheduling the hearing, the district court decided that the briefs filed by the parties were adequate to allow the court to rule on the defendants' motion to dismiss. On September 6, 1985, the district court granted the motion to dismiss the cause of action, because of a lack of jurisdiction and a lack of standing. *See Smith v. Meese*, 617 F.Supp. 658 (M.D.Ala.1985).

On September 16, 1985, the plaintiffs filed motions for reconsideration of the dismissal, for oral argument, and for leave to amend the complaint. In their motion to amend the complaint, the plaintiffs sought only to replace the original definition of the class sought to be represented. Instead of a class of all black registered voters in five specific counties, the plaintiffs sought to limit the class to include

all black citizens in Greene, Lowndes, Perry, Sumter, and Wilcox Counties (1) who have been placed in such fear by defendants' conduct that they have limited their associational and political activities, (ii) who belong to organizations or are part of groups whose associational or political activities have been interfered with, chilled, and/or made more difficult as a result of the conduct alleged herein, (iii) who have been victims of voter fraud

or intimidation committed by whites, or (iv) who intend to run for elective office and whose electoral support has been diminished as a result of defendants' conduct.

Motion for Leave to Amend at 1.

On September 20, 1985, the district court granted the motion for leave to amend the complaint, thus limiting the class the plaintiffs seek to represent. In the same order, however, the district court denied without oral argument the plaintiffs' motion for reconsideration of the dismissal. On September 30, 1985, the plaintiffs filed a notice of appeal from the orders dismissing the complaint and denying reconsideration of the dismissal.

In October of 1985, this court raised *sua sponte* the jurisdictional question of whether the two September orders are appealable in light of the district court's September 20 grant of leave to amend the complaint. The language of that latter order does not clearly indicate that the cause of action was dismissed. After receiving briefing from the parties on that question, the court withheld a decision on the jurisdictional issue. The parties filed their briefs and oral argument was held in September of 1986.

C. *Appealability of the District Court Orders*

■ The panel has considered the district court record and the briefs submitted by the parties on the jurisdictional issue raised *sua sponte* by the court, and now concludes that the two September, 1985 orders do constitute final orders and thus are appealable. Although the September 20 order refers to the September 6 order as dismissing the *complaint,* and not the *cause of action,* the September 6 order plainly did dismiss the entire action and the September 20 order did not disturb that dismissal. A fair reading of the two orders together leads us to conclude that the dismissal is a final, appealable order. *See Czeremcha v. International Association of Machinist and Aerospace Workers,* 724 F.2d 1552, 1554–55 (11th Cir.1984).

Having decided that this appeal is properly before this court, we must now turn to the primary issues of the case—the two jurisdictional issues that formed the bases of the district court's dismissal of this action.

## II. THE SEPARATION OF POWERS

The initial issue to be confronted is whether the doctrine of the separation of powers prevents federal court review of the Attorney General's prosecution policies in the context of a suit by individuals who have not been and are not currently expected to be the direct focus, or "target," of an investigation or prosecution. It is beyond question that a target of a prosecution can raise a claim of selective prosecution to defeat an indictment. *See Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 1531–32, 84 L.Ed.2d 547 (1985). The plaintiffs in this case, however, do not challenge any particular decision to prosecute or not to prosecute any individual. Instead, they challenge a policy and pattern of investigatory and prosecutory decisions, alleging that the policy has the effect of depriving them of their constitutional rights to vote and to associate freely. In the context of federal prosecutorial decisionmaking, this is a question of first impression in this circuit. In a similar case, the Ninth Circuit sitting en banc has held that the federal courts do have jurisdiction to review a prosecutorial policy of the type alleged here. *See Olagues v. Russoniello,* 797 F.2d 1511 (9th Cir.1986) (en banc), *cert. granted,* —— U.S. ——, 107 S.Ct. 1885, 95 L.Ed.2d 493 (1987). For the reasons set out below, we agree with the Ninth Circuit.

■ Before directly addressing the separation of powers issue, however, we briefly note the importance of the rights allegedly being abused in this case—the constitutional rights to associate freely and, perhaps most important in our governmental structure, to vote. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362,

1378, 12 L.Ed.2d 506 (1964). The constitutional protection for the right to vote encompasses protections about registering to vote and voting with absentee ballots. *See, e.g., Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); *Toney v. White*, 476 F.2d 203 (5th Cir.), *modified*, 488 F.2d 310 (5th Cir.1973) (en banc). These rights, coupled with the important rights to associate freely as protected by the First Amendment, are the rights that the plaintiffs allege the defendants are violating by their prosecution and investigatory policies.

In considering the separation of powers as it relates to the challenged policies and their intended result, we start with the proposition that there is nothing inherent in the prosecutorial function that would suggest insulating prosecutorial policies from judicial review. In a case analogous to this one, the Fifth Circuit enjoined a policy and pattern of state prosecutions aimed at discouraging blacks from registering to vote and freely exercising their vote. *See United States v. McLeod*, 385 F.2d 734 (5th Cir.1967). As is alleged in this case, the state officials in *McLeod* engaged in a pattern of baseless or weak prosecutions and investigations aimed at interfering with an on-going voter registration drive. In enjoining the actions of the state officials, the Fifth Circuit noted that "[h]arassment in the form of baseless arrests and prosecutions is one of the most effective means of putting a halt to a voter registration drive." *Id.* at 747. The court rejected the argument that the prosecutions could be challenged individually, recognizing that

the harm "is worked, for the most part, not by final judgments of conviction but by mesne process." *Id.* at 748 (quoting Amsterdam, *Criminal Prosecutions Affecting Federally Guaranteed Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial*, 113 U.Pa.L. Rev. 793, 909 (1965)). As in the *McLeod* case, the plaintiffs here are seeking to stop an alleged pattern of discriminatory investigations that are aimed at intimidating blacks and chilling the exercise of their constitutional rights.

It is important to note that the plaintiffs in this case are not attempting to have the federal judiciary review individual decisions to investigate or prosecute anyone. Appellants' Brief at 27. In general, "the decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 105 S.Ct. at 1531.[1] Notwithstanding this hesitancy to intervene in prosecutorial decisions, we have in appropriate cases enjoined bad faith prosecutions of specific individuals. *See, e.g., Fitzgerald v. Peek*, 636 F.2d 943 (5th Cir. Jan. 1981) (enjoining prosecutions brought to harass individuals for exercising their First Amendment rights), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir.1979) (same). In this case, however, we are not asked to block or require the prosecution of any individual;[2] instead, the plaintiffs have asked the federal court to order the defendants to stop following a deliberate policy of discriminatory investigations and prosecutions.[3]

---

1. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systematic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.
*Wayte,* 105 S.Ct. at 1531.

2. The instant complaint does not ask the court to assume the essentially Executive function of deciding whether a particular alleged violator should be prosecuted. Rather, the complaint seeks a conventionally judicial determination of whether certain fixed policies allegedly followed by the Justice Department and the United States Attorney's office lie outside the constitutional and statutory limits of "prosecutorial discretion."
*Nader v. Saxbe,* 497 F.2d 676, 679 (D.C.Cir.1974) (footnotes omitted).

3. If the plaintiffs can on remand establish the facts that they allege in their complaint, the district court will be faced with the difficult question of the appropriate remedy in this case. At this stage in the proceedings, without the benefit of discovery or trial, it is difficult to

█ In light of *United States v. McLeod,* approving a broad injunction against unconstitutional pattern of state prosecutions, and cases such as *Fitzgerald v. Peek* and *Wilson v. Thompson,* enjoining specific state prosecutions, it is clear that the federal courts have both the jurisdiction and competence to enjoin unconstitutional prosecutorial decisionmaking of *state* officials. In this case, however, we are being asked to stop impermissible conduct on the part of *federal* officials and prosecutors. With state officials, federal courts must consider the principles of comity in deciding to intervene; with federal officials, the federal courts must instead respect the doctrine of the separation of powers as set out in our Constitution. In this case, we must decide whether the doctrine of separation of powers is a bar to a federal court injunction of conduct which could be enjoined if state officials were the defendants.

We first note that it would be quite anomalous if the federal Constitution protected citizens from violations of their rights by state officials but at the same time did not protect the same citizens from the same violations by federal officials. It would be unusual, to say the least, if federal officials could ignore the federal constitution in situations where state officials could not. The potential anomaly aside, the doctrine of separation of powers could require that result. After a consideration of the doctrine and the relevant case law, however, we find that it does not.

█ In section 3 of article II of the Constitution, the text commits to the executive branch of our government the responsibility, and the power, to "take Care that the Laws be faithfully executed." In performing that responsibility, officials of the executive have an obligation to uphold and support the Constitution. U.S. Const. art. VI. The prosecutorial function, and the discretion that accompanies it, is thus committed

by the Constitution to the executive, and the judicial branch's deference to the executive on prosecutorial decisionmaking is grounded in the constitutional separation of powers. *See United States v. Greene,* 697 F.2d 1229, 1235 (5th Cir.) (discussing deference to executive), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983).

Yet, from the early times of our constitutional system courts have recognized that the executive is not above review in the conduct of responsibilities constitutionally committed to it. "If one of the heads of [executive] departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803). "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Id.* at 163.

The Supreme Court noted in *Marbury* that "the question, whether the legality of an act of a head of a department be examinable in a court of justice or not, must always depend on the nature of that act." *Id.* at 165. The areas in which "the decision[s] of the executive [are] conclusive" are "political": "They respect the nation, not individual rights." *Id.* at 166.

█ In this case, the plaintiffs have alleged that the defendants are interfering with the plaintiffs' individual rights—their First, Fourteenth and Fifteenth Amendment rights. While the area of prosecutorial and investigative discretion is one in which we normally defer to the co-equal executive branch, in this case, if the allegations are true, the defendants have exceeded the bounds of their discretion. While

predict the exact nature of a possible injunction in this case. If the plaintiffs can establish the alleged discriminatory and chilling policy on the part of the defendants, the appropriate remedy will depend on the type and extent of the unconstitutional policy. It is unlikely that the appropriate remedy would be for the district

court to enjoin all voting fraud prosecutions or to require prosecutions of all possible election crimes. Instead, it is likely that the district court would order the defendants to make prosecutorial decisions based on *constitutional* factors, instead of targeting one race or one political party for investigation.

the executive has discretion over prosecutorial decisions, it has no discretion to violate the constitutional rights of individuals.[4] In considering the "nature of the act" as suggested in *Marbury*, we will not look to the characterization by the defendants of their acts—in this case, the legitimate exercise of prosecutorial discretion—but instead, we will look at the underlying allegations—the widespread violation of the associational and political rights of a large group of people in the Alabama "Black Belt."[5] The defendants cannot cloak constitutional violations under the guise of prosecutorial discretion and expect the federal courts simply to look the other way. Of course, on the other hand, the plaintiffs bear the burden of proving their allegations, and if the facts do not support their allegations but instead suggest the exercise of legitimate prosecutorial and investigative discretion, the federal courts should not intervene.

In various contexts, the federal courts have been willing to intervene where prosecutorial decisions by the executive branch encroach on constitutional rights of individuals. *See, e.g., Olagues v. Russoniello*, 797 F.2d 1511 (9th Cir.1986) (reversing dismissal of complaint in facts similar to this case), *cert. granted,* —— U.S. ——, 107 S.Ct. 1885, 95 L.Ed.2d 493 (1987); *Angola v. Civiletti*, 666 F.2d 1 (2d Cir.1981) (reversing dismissal of complaint alleging violation of associational rights by FBI investigations of third party). Contrary to the arguments of the defendants in this case, the Fifth Circuit's opinion in *United States v. Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), does not suggest otherwise. In that case, the court wrote that "as an incident of the constitutional separation of powers, ... the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions." *Id.* at 171 (footnote omitted). In the *Cox* case, however, there was no suggestion that the executive branch was violating any constitutional obligations or encroaching on anyone's constitutional rights. *Cox* involved an order of a district court requiring the attorney for the United States to sign an indictment issued by a federal grand jury. The *Cox* case reaffirmed the long-standing rule that the decision not to prosecute an individual is generally a matter for executive discretion. *Cox* does not suggest that the executive can exercise its discretion in a manner that violates the constitutional rights of a group of individuals, nor does *Cox* require a federal court to close its doors to claims of such violations.

■ In the context of abusive prosecutions, we have limited *Cox* along these same lines:

> The doctrine of separation of powers, inherent in our tripartite constitutional

---

4. The Executive's constitutional duty to "take Care that the Laws be faithfully executed," Art. II, § 3, applies to all laws, not merely to criminal statutes. It would seem to follow that the exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review. The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that authority. Judicial review of the latter sort is normally available unless Congress has expressly withdrawn it.

> [T]he decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness.

*Nader v. Saxbe*, 497 F.2d at 679 n. 19 (D.C.Cir. 1974) (citations omitted).

5. "Although prosecutorial discretion is very broad under our system, it is obvious that the government cannot selectively enforce a law by prosecuting only Republicans, or only Caucasians, or only Southerners who violate the law." *United States v. Schmucker*, 721 F.2d 1046, 1049 (6th Cir.1983) (citations omitted), *vacated without reaching merits*, 471 U.S. 1001, 105 S.Ct. 1860, 85 L.Ed.2d 155 (1985).

> As a substantive matter, the constitutional authority to "take care that the laws [are] faithfully executed" is textually committed to the authority of the executive branch, and the authority of the executive branch to enforce the law in a selective fashion is legally unchallengable absent proof by the defendant that the government has exercised its discretion upon an invidious basis such as race.

*United States v. Chagra*, 669 F.2d 241 (5th Cir.) (citations omitted), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982).

scheme of government, prohibits free judicial interference with the exercise of the discretionary powers of the attorneys of the United States over criminal prosecutions. [citing *Cox*] However, "[t]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government." Therefore, in the rare situation in which the decision to prosecute is so abusive of this discretion as to encroach on constitutionally protected rights, the judiciary must protect against unconstitutional deprivations.

*United States v. Johnson,* 577 F.2d 1304, 1307 (5th Cir.1978) (citations omitted). If the facts are as plaintiffs allege, this case presents one of those "rare situations" in which federal court intervention in the prosecutorial and investigative process is appropriate. The separation of powers doctrine of our Constitution divides responsibilities and powers of government between the three co-equal branches. Yet the Constitution also imposes on all three branches a duty to uphold and support the Constitution, and when the other branches of government fail in that duty, the judicial branch has the power and the obligation to redress the violation. *See Marbury v. Madison,* 5 U.S. (1 Cranch) at 165–66.[6]

### III. STANDING

Having concluded that the allegations in the plaintiffs' complaint present constitutional claims over which the federal courts have jurisdiction, we now turn to the question of whether the plaintiffs have sufficient standing to raise the claims. To answer this, we must resolve two questions: (1) whether individuals who are not themselves targets or likely future targets of discriminatory prosecutions and investiga-

tions can ever have standing to contest the alleged unconstitutional prosecution policy, and if so, (2) whether the complaint in this case alleges sufficient facts to assert such standing.

### A. *Standing Generally*

There is little disagreement among the parties in this case about the general rules governing the standing requirement for federal court jurisdiction:

> The Article III component to standing requires that a plaintiff allege he has suffered actual or threatened injury at the hands of the defendant, *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1976), fairly traceable to the allegedly unlawful conduct, *Duke Power [Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) ], and likely to be redressed by the requested relief, *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976). These requirements tend to assure that questions presented to a court will be resolved "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge [Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) ].

*Steele v. National Firearms Act Branch,* 755 F.2d 1410 (11th Cir.1985). It is clear that a direct target of a discriminatory investigation or prosecution has standing to attack the violation. *See Olagues v. Russoniello,* 797 F.2d 1511, 1517–18 (9th Cir.1986) (en banc), *cert. granted,* — U.S. —, 107 S.Ct. 1885, 95 L.Ed.2d 493 (1987).[7]

---

**6.** In other contexts, the Supreme Court has rejected the separation of powers as a bar to judicial review when justice or the Constitution so required. *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (executive branch); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (legislative branch).

**7.** It is equally clear that organizations can have the requisite standing where the associational

rights of their members are infringed and where the activities of the organizations are restricted or injured by unconstitutional conduct. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Olagues,* 797 F.2d at 1518–19. In this case, however, there are no organizational plaintiffs, even though the complaint details alleged injuries to various orga-

It is less clear that an individual who is in the "target group" being discriminated against, but who is not actually being investigated, has the requisite standing.

■ In considering the three-part test for standing set out in *Gladsone, Duke Power, Simon,* and other cases, the second and third components are not stumbling blocks to standing in a case such as this one. In considering a case where a stated governmental investigatory policy discriminates against a specific group of people and thereby chills that group's associational and political rights, the second component—that the alleged injury be fairly traceable to the officials responsible for the policy—is easily alleged for the purposes of a standing inquiry on a motion to dismiss. The third component—that the injury be redressable by the requested relief—is also easily established in a case where the alleged injury arises from an identifiable discriminatory policy. While the exact nature of the possible relief cannot be predicted without a full development of the facts, an order enjoining the policy and requiring non-discriminatory investigation and enforcement would redress the injury.[8]

We are left with the question of whether the alleged injury itself is sufficient to establish standing. Not all harms meet the requirement of an "actual or threatened injury." "Abstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted).

The injury alleged here—the chilling of plaintiffs' associational and political rights, specifically the chilling of the plaintiffs' right to vote—can be "real and immediate."

If individuals fail to vote because of intimidation by government officials, whether or not specifically targeted at the individuals, the individuals have been injured, especially in light of the importance of the vote in our political system. If office holders or candidates are harmed in their ability to run for office or to be re-elected, their injury is enough to satisfy the standing requirement. While not always easy to establish, such injury is palpable and has actual detrimental effect on the victims of the violation.

■ The defendants argue that *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), holds that a "chilling" of constitutional rights is insufficient to establish direct injury. The Supreme Court wrote in that case that "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14, 92 S.Ct. at 2325–26. The *Laird* case, however, involved an attack by concerned citizens on an Army practice of surveillance of civilians. This general claim is in contrast to an attack by a group of people on a specifically articulated discriminatory governmental policy which has already had the demonstrable objective effect of limiting, or chilling, the exercise of protected constitutional rights. In an appropriate case, with sufficient allegations in a complaint, such a discriminatory policy would give rise to an injury sufficient to establish standing to attack the policy.

### B. Standing in this Case

■ We must finally decide whether this is such an appropriate case, with sufficient allegations of a discriminatory policy that suggest an injury to these plaintiffs. We note at the outset that the district court seemed to misunderstand the plaintiffs

---

nizations and their members (including the named plaintiffs).

**8.** *See supra* note 3. Such an injunction would not require constant court supervision of prosecutorial decisionmakers. If enjoined, the defendants would presumably heed the order of the court to stop effectuating the discriminatory

policy and to initiate investigations and prosecutions based on constitutionally permissible factors. If the defendants persisted in following the enjoined policy, the plaintiffs could return to court and ask the court to cite the defendants with contempt.

complaint. In that court's discussion of standing, the opinion is framed only in terms of a claim of selective prosecution. 617 F.Supp. at 660. Based on its erroneous interpretation that the plaintiffs alleged only that they were directly injured because of selective prosecution, the district court ruled that the remedy for the plaintiffs would be as a defense to a prosecution brought against them. The district court missed the point of the complaint (which is certainly not a model of clarity and careful draftsmanship); instead of saying that the plaintiffs have been selectively prosecuted, or have been hurt solely by selective prosecutions, the complaint alleges that the defendants' entire prosecutorial and investigative policy (including selective prosecutions) has chilled the plaintiffs' free exercise of their political and associational rights. The injury claimed in this case is not the harm from an unconstitutional prosecution, but the broader harm from an unconstitutional pattern and policy of discriminatory prosecutions and investigations. Thus, if for no other reason than the district court was misled by a poorly drawn complaint, we must vacate the district court's dismissal for lack of standing.

Because the standing decision will at this point be based solely on the pleadings, we do not see the need to remand the case for an initial determination of the standing question. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *see also*

*Jenkins v. McKeithen,* 395 U.S. 411, 422–23, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969) (plurality opinion). The components of standing must "be pleaded with a fair degree of specificity." *Steele v. National Firearms Act Branch,* 755 F.2d 1410, 1414 (11th Cir.1985). In this case, the plaintiffs adequately pleaded two of the three components—causation and redressability. The plaintiffs also make clear the alleged injury—the chilling of constitutionally protected rights—the rights to vote and to seek political office free from intimidation and interference.

What the complaint does not make crystal clear, however, is the connection the named plaintiffs have to the injury alleged. Although a fair reading of the complaint, "construe[d] in favor of the complaining party," reveals that the named plaintiffs are alleging injury to themselves, the complaint fails to make that one, simple point clear. The complaint discusses the injury to "black people" and "black elected officials and activists" caused by the defendants' discriminatory policy. The complaint states that the named plaintiffs are black and some are elected officials and activists. Yet the complaint never takes the final step to assert that the actions of the defendants have harmed the plaintiffs personally. The complaint requires the reviewing court to make an obvious logical jump: The defendants are harming blacks and black elected officials in Alabama's "Black Belt;" the plaintiffs are blacks and black elected officials in Alabama's "Black Belt;" therefore, the defendants are harming the plaintiffs.[9] A more formalistic approach would suggest that, although the defendants' alleged actions have adversely

---

**9.** The near triviality of the error does not make the resolution of the problem easier. To avoid the problem encountered here, the plaintiffs needed only to allege in a few key places within their complaint that "the defendants' conduct interferes with the associational activities of the plaintiffs and other black citizens ...," instead of alleging (as the complaint did) that "the defendants' conduct interferes with the associational activities of black citizens...."

In this opinion, we reject an overly formalistic approach to pleading and refuse to dismiss the complaint for this oversight. Even if we adopted the formalistic approach, however, we

would still refuse to dismiss the complaint, because in the 19 pages and almost 100 paragraphs of the complaint, the plaintiffs did in *one* paragraph—paragraph 68—allege a specific injury of the named plaintiffs caused by the defendants. In that paragraph, the complaint states that the "defendants' conduct is intended ... to discourage plaintiffs and the plaintiff class from engaging in associational and political activities...." Complaint at 14–15. While not the strongest allegation found in the complaint, that paragraph does use enough "magic words" to fulfill even formalistic requirements for standing.

affected black voting in the local area, the plaintiffs (some of whom are locally elected officials) *might* not be affected, and thus the plaintiffs do not have standing. We prefer to take a more logical, and common-sensical, approach.[10]

In deciding whether to make that logical jump, we have three options: First, we could refuse to afford the complaint its obvious meaning, and therefore dismiss the complaint. Second, we could remand the case and "require the plaintiff[s] to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff[s'] standing." *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206–07. *See Steele*, 755 F.2d at 1415. And third, we could accept the plainest meaning of the complaint and find that the plaintiffs have sufficiently asserted a connection to the injury alleged.

We decline to adopt the first approach because to do so would take a step backwards from the innovations of notice pleading and would violate the guideline that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Dismissing the complaint for the failure to choose the correct words, when the meaning of the allegations are clear, would return us to the days of the common law forms of pleading.

While the decision between the latter two options is close, we choose to find standing based on the complaint in its current form.

While not a model of clarity, the complaint does sufficiently state an alleged injury to the plaintiffs. In so deciding, we follow the lead of the old Fifth Circuit, which said in a voting rights case that the "initial pleading, which is required only to give notice of the claim, must be construed liberally so as to do substantial justice." *United States v. Uvalde Consolidated Independent School District*, 625 F.2d 547, 549 (5th Cir.1980), *cert. denied*, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981).[11] On remand, the plaintiffs should be allowed to amend their complaint to better frame the issues. If, after discovery, the allegations cannot be supported, the district court may again entertain a motion challenging standing.

## IV. CONCLUSION

In Part II above, we found that the complaint stated a cause of action appropriate for consideration in the federal courts. In Part III, we determined that, based on the complaint, the plaintiffs have standing to pursue the cause of action. For the reasons stated, the dismissal of the cause of action by the district court is hereby REVERSED and the cause REMANDED for further proceedings.

HENDERSON, Senior Circuit Judge, dissenting:

I respectfully dissent because I believe that the plaintiffs have not sufficiently alleged concrete injury to themselves satisfying the constitutional requirement of standing. Because of this deficiency, the com-

---

**10.** Of course, if on remand the evidence reveals that the allegations of harm to the named plaintiffs cannot be supported, the defendants can again challenge standing based on the fuller factual record.

**11.** The facts of this case are analogous to those in *Brown v. Post*, 279 F.Supp. 60 (W.D.La.1968). In *Brown*, the initial plaintiffs were a black politician who unsuccessfully ran in a local election, and a number of black voters. The challenged actions in this case were different than those in *Brown*—the failure to extend the same absentee ballot privileges to blacks as were extended to whites—but the ultimate nature of the claim is similar. The plaintiffs challenged the diminution to their voting power and

the ill effect that diminution had on the black politician's election chances. Although no direct action was taken against the plaintiffs in *Brown*, and there is no suggestion that any of the plaintiffs were themselves refused an absentee ballot, the court in *Brown* upheld the plaintiffs' challenge to the unconstitutional practices. The primary relevant difference between the *Brown* case and this one is that in *Brown* the United States joined the individual plaintiffs in the action against the local officials, while here the U.S. officials are the defendants. This difference does not undercut the unconstitutionality of the alleged actions nor the ability of the plaintiffs to challenge those actions.

plaint in its present form fails to confer on the district court jurisdiction to entertain further proceedings in the case.

Article III, section two of the United States Constitution directs federal courts to adjudicate only "cases or controversies." Perhaps the most important corollary of this Article III requirement of federal judicial power is that the plaintiff have standing to invoke the jurisdiction of the court. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984). The Supreme Court has cautioned that a litigant does not have standing to bring a suit unless he has "alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975), *quoting, Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962). To establish standing, a plaintiff must allege at an "irreducible minimum" that he has personally suffered some actual or threatened injury as a result of the defendant's allegedly illegal behavior and that the "injury is likely to be redressed by a favorable decision." *Valley Forge College v. Americans United,* 454 U.S. 464, 472, 102 S.Ct. 752, 759, 70 L.Ed.2d 700, 709 (1982).

Resolution of the standing issue in this case revolves around a determination of whether the plaintiffs have alleged an injury-in-fact satisfying the first prong of the tripartite test. The complaint states that black voters and political leaders in the Black Belt counties have suffered a chill of their associational and political rights as a result of the defendants' discriminatory policies of selective prosecution, unfounded investigations and intimidation of black voters and black political candidates. The majority finds that these allegations adequately set out a distinct injury conferring standing on these parties whether or not the government officials have targeted any coercive measures against the named plaintiffs. Relying on the authority of *Laird v. Tatum,* 408 U.S. 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), I disagree and would require a more specific allegation that the interference experienced by the plaintiffs flows directly from an imminent or actual threat that the defendants will pursue their discriminatory and abusive tactics against these particular individuals.

In *Laird v. Tatum,* the Supreme Court held that a group of citizens did not have standing to challenge the civilian surveillance practice of the Department of the Army. The plaintiffs claimed that the existence of this practice, although there was no actual or imminent danger that they would be surveilled, frustrated their first amendment rights of free expression. While the Court noted that in prior cases the chilling effect of an unconstitutional practice had been found sufficient to confer standing, the shadow on the exercise of constitutional rights in those decisions arose from the plaintiff's knowledge that he himself was either "presently or prospectively subject to the regulations, proscriptions or compulsions that he was challenging." *Id.* at 11, 92 S.Ct. at 2324, 33 L.Ed.2d at 162. Since the citizens in *Laird* did not make clear the essential connection between the Army's surveillance activity and the threat to their first amendment rights by showing that they had sustained or were immediately in danger of sustaining a direct injury as a result of the Army's action, *Id.* at 13, 92 S.Ct. at 2325, 33 L.Ed.2d at 163 the Court dismissed their claim as a "subjective 'chill' " which did not constitute an injury in fact. *Laird,* at 14, 92 S.Ct. at 2326, 33 L.Ed.2d at 163–64.

The majority distinguishes *Laird* because the challenged governmental conduct in this case is not a neutral practice aimed at the general populace but rather an openly discriminatory policy directed toward a discrete group of individuals which has resulted in a "demonstrable objective effect" of chilling the group's exercise of protected rights. In my view, these distinguishing factors are relevant only so far as they heighten the *possibility* that these plaintiffs' rights have been inhibited because of an imminent threat that the government's intimidation tactics will be turned on them. In the absence of an express allegation of such a causal link, however, I am forced to

conclude that the plaintiffs have not sufficiently alleged a personal stake in this controversy justifying their invocation of the jurisdiction of the district court. To the extent that the majority opinion holds that the plaintiffs' limitation of their constitutional rights based on the government's purportedly discriminatory treatment of others without any imminent danger that the plaintiffs themselves will be targeted sufficiently alleges a distinct and palpable injury, I respectfully disagree.

Furthermore, I do not believe that the complaint alleges a concrete injury by *almost* stating that *these plaintiffs* have suffered a personal harm as a result of the defendants' conduct. Even under the liberal standards of notice pleading, I cannot square the total absence of any direct allegation of personal harm to the individuals seeking the protection of a federal court [1] with the express mandate of our own circuit that the constitutionally required components of standing be pleaded "with a fair degree of specificity." *Steele v. National Firearms Act Branch*, 755 F.2d 1410, 1414 (11th Cir.1985). As the Supreme Court has recognized, the concept of Article III standing has eluded a clear and consistent definition. *Valley Forge College v. American United*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700, 711 (1982). District courts, faced with an inartfully drawn complaint like the one at issue, already have a difficult task in comprehending challenges to standing. By blurring one of the few bright lines in this area of the law—the requirement that the plaintiff allege a personal injury—I fear that the majority has unintentionally added to the confusion. For this reason as well, I differ with the majority's conclusion that the plaintiffs have standing to pursue their claims based on the sparse allegations contained in this complaint.

---

**1.** The majority points to paragraph 68 as the one instance where the plaintiffs allege a specific injury to themselves caused by the defendants' conduct. That paragraph, however, states only that the defendants conduct is *intended* to cause the plaintiffs harm, not that they have succeeded. In my view, this is a thin reed upon which to hang a finding that the plaintiffs have fulfilled the constitutional requirement of direct injury.