Dr. Lenora B. FULANI and Lenora B. Fulani For President, Plaintiffs,

v.

Nicholas F. BRADY, Secretary of the Treasury, Shirley D. Peterson, Commissioner of Internal Revenue, and League of Women Voters Education Fund, Defendants.

No. 92 Civ. 0998 (RWS)

United States District Court, S.D. New York.

Jan. 5, 1993.

Arthur R. Block, New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty. S.D.N.Y. by Kay K. Gardiner, Asst. U.S. Atty., of counsel, New York City, for federal defendants.

Arnold & Porter by Michael D. Schissel, of counsel, New York City, for defendant League of Women Voters Educ. Fund.

## OPINION

SWEET, District Judge.

The Defendants Nicholas F. Brady and Shirley D. Peterson (collectively, the "Federal Defendants"), joined by the Defendant League of Women Voters Education Fund (the "League"), have moved pursuant to Rule 12(b)(1) and (6), Fed.R.Civ.P., for an order dismissing the First Amended Complaint (the "Amended Complaint") of Plaintiffs Lenora B. Fulani and Lenora B. Fulani

for President (collectively, "Fulani") for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief may be granted. For the reasons set forth below, the Defendants' 12(b)(1) motion is denied, but their 12(b)(6) motion is granted and the Amended Complaint is dismissed.

*The Parties*

Plaintiff Lenora B. Fulani is a self-described national political leader with a core constituency of African–American citizens. She is the chairperson of the New Alliance party and was the first woman and the first African–American to be on the ballot in each of the fifty states. Plaintiff Lenora B. Fulani for President is the political organization that ran Fulani's 1992 presidential campaign.

Defendant Nicholas F. Brady is the Secretary of the Treasury and Defendant Shirley D. Peterson is the Commissioner of Internal Revenue.

Defendant League of Women Voters (the "League") is a private, not-for-profit charitable trust established by the League of Women Voters of the United States ("LWVUS") in the District of Columbia in 1957 and devoted exclusively to educational purposes.[1]

*Prior Proceedings*

On February 7, 1992, Fulani filed the original complaint in this action, which challenges the Federal Defendants' failure to enforce the non-electioneering prohibitions of § 501(c)(3), and which named Nicholas Brady, Secretary of the Treasury, and Shirley D. Peterson, Commissioner of Internal Revenue, as defendants. Fulani filed the Amended Complaint, naming the League as a party defendant, on February 13, 1992. Fulani sought a preliminary injunction compelling the Federal Defendants to revoke the League's tax-exempt status prior to the New Hampshire Democratic presidential primary debate cosponsored by the League and the Cable News Network ("CNN") and scheduled for February 16, 1992.

[1]. LWVUS is a separate entity from the League and is not a party to this action.

Fulani's motion for a temporary restraining order and a preliminary injunction was heard in Part I before the Honorable John E. Sprizzo. Judge Sprizzo, reading the opinion into the record from the bench, denied Fulani's motion. Fulani filed a notice of appeal of Judge Sprizzo's decision with the Second Circuit.[2] This Court granted the Federal Defendants' motion for a stay of discovery pending the decision of the Second Circuit. *See Fulani v. Brady*, No. 92 Civ. 0998 (RWS), 1992 WL 116779, 1992 U.S.Dist. LEXIS 7320 (S.D.N.Y. May 19, 1992). In July 1992, the Second Circuit dismissed the appeal as moot because the debate, which Fulani had sought to enjoin, had been held on February 16, 1992. *See Fulani v. Brady*, 972 F.2d 1329 (2d Cir.1992).

The Federal Defendants now move for dismissal of Fulani's Amended Complaint on the ground that either this Court does not have jurisdiction over the subject matter of this action because Fulani does not have standing to sue the League and the Federal Defendants, or that, even if Fulani does have standing, she has failed to state a claim upon which relief may be granted.

This motion was filed by the Federal Defendants on July 7, 1992. The Court heard oral arguments and considered the motion fully submitted on September 23, 1992.

*Facts*[3]

Since its founding in 1957, the League has frequently sponsored Democratic and Republican presidential primary debates, and presidential and vice-presidential general election debates. In 1984, the League sponsored four Democratic presidential primary debates, one vice-presidential general election debate, and two presidential general election debates. In 1988, the League sponsored one Republican presidential primary debate and two Democratic presidential primary debates. The purpose of the League's primary debates is to educate the nation's electorate about the issues and the positions of the candidates running in the primary election campaigns, and to stimulate voter interest and participation in the electoral process.

Fulani ran for the presidency of the United States in 1988 as an independent and minor party candidate. In response to her exclusion from the League-sponsored presidential primary debates, Fulani filed an action against the League and moved for a temporary restraining order and preliminary injunction against the League. *See Fulani v. League of Women Voters Educ. Fund*, 684 F.Supp. 1185 (S.D.N.Y.1988) ("*Fulani I*"). This Court denied that motion, and the Second Circuit affirmed and dismissed the action. *See Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621 (2d Cir.1989) ("*Fulani II*").

After being excluded from the 1988 presidential debates sponsored by the Commission on Presidential Debates ("CPD"), Fulani brought an action against the Federal Defendants and the CPD in the District Court for the District of Columbia, seeking the revocation of the CPD's tax-exempt status. The court dismissed the action, *see Fulani v. Brady*, 729 F.Supp. 158 (D.D.C. 1990), and a divided Court of Appeals affirmed. *See Fulani v. Brady*, 935 F.2d 1324 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992) (Mikva, C.J., dissenting) ("*Fulani III*").

In February 1991, Fulani declared her candidacy for the presidency in the 1992 race. She began as an independent and minor party candidate, while calling upon Rev. Jesse Jackson to compete for the

---

**2.** Fulani also moved for a stay of the Debate pending the decision of the Second Circuit. On February 14, 1992, the motion was denied insofar as it sought a preliminary injunction directing the federal defendants to suspend or revoke the League's tax exempt status prior to the debate on February 16, 1992. Fulani subsequently withdrew her motion for a stay pending appeal.

**3.** As is discussed in detail below, on the face of a Rule 12(b) motion to dismiss, a plaintiff's factual allegations are presumed to be true and all factual inferences are drawn in the plaintiff's favor. Therefore, the factual allegations set forth here do not constitute findings of fact by the Court but rather are taken from Fulani's Amended Complaint and the Joint Appendix prepared in cooperation by the parties for the appeal before the Second Circuit of Judge Sprizzo's denial of Fulani's motion for a temporary restraining order and preliminary injunction.

Democratic party nomination and pledging that she would support him in 1992, as she and her supporters had done in 1984 and 1988. Fulani organized a campaign structure that qualified her for federal matching funds in the 1992 race ahead of all the other candidates of both major parties, and in December 1991, the Federal Elections Commission ("FEC") announced that Fulani had raised more matchable contributions than President George Bush and Tom Harkin.

When Rev. Jackson announced that he would not seek the Democratic party nomination in 1992, Fulani entered the Democratic party race. On December 17, 1991, she filed as a candidate in the New Hampshire Democratic party primary, and her ballot access counsel gave routine notice to the FEC that she was entering a number of Democratic party nominating contests. Fulani immediately set up a fully staffed campaign and press office in Manchester, New Hampshire, and re-oriented her full-time itinerary of campaign appearances to focus on that state.

The New Hampshire Democratic party (the "State Party") planned a series of debates before live audiences among "major" candidates for the party's nomination. The most significant debates were scheduled for three Sundays—December 19, 1991, in Nashua, January 19, 1992, in Manchester, and February 10, 1992, in Claremont. Fulani was told that she did not qualify for inclusion in the debates because she had never held statewide office.

Fulani, however, ended up participating in the Nashua debate. At the beginning of that debate another insurgent Democrat, former Mayor of Irvine, California, Larry Agran, stood up in the audience and protested his exclusion. The moderator instructed police officers to physically eject Agran from the room. Spontaneously, members of the audience shouted protests and asked for Agran and then Fulani to be included, which they were.

In planning for the subsequent debates, the State Party publicly stated that Fulani and Agran would not be included in any further party-sponsored debates. To avoid a repeat of the Nashua call for the insurgent candidates from the audience, the State Party moved the Manchester debate to a closed television studio, which drew the wrath of hearty protestors who picketed the studio in sub-zero weather. Rather than attempt to hold another exclusionary debate before an audience of rank and file democrats, the State Party finally decided simply to cancel the Claremont debate altogether.

In 1992, the League agreed with the Cable News Network ("CNN") to co-sponsor one Democratic party presidential primary debate and one Republican presidential primary debate prior to the New Hampshire primary. The Democratic party debate (the "Debate") was scheduled to be held in St. Anselm on February 16, 1992, two days before the New Hampshire primary election. The events surrounding the Democratic primary debate are the focus of Fulani's complaint.

In January 1992, Fulani's campaign inquired of the League regarding her inclusion in the Debate. In a letter dated January 16, 1992, the League provided the Fulani campaign with its "New Hampshire Democratic Presidential Primary Debate Participation Criteria" ("Selection Criteria") and gave Fulani until January 24 to demonstrate that she qualified to be included under the Selection Criteria. Fulani submitted a detailed analysis, complete with full documentation, to show that her candidacy met all of the Selection Criteria. The League responded with a pro-forma rejection dated January 23, 1992 and denied Fulani's request on the ground that she did not meet the League's Selection Criteria because she was not a "significant" candidate for the Democratic party's nomination for president.

Fulani made a written demand on the Federal Defendants to revoke the League's tax exemption prior to the Debate, because the League acted in a partisan manner, violating the statutes proscribing the involvement of tax exempt organizations in the political arena. The Internal Revenue Service ("IRS") responded that it would not be able to inform Fulani as to what action,

if any, it might take in response to her demand. She then commenced this action, and sought a preliminary injunction against the IRS, which was denied by Judge Sprizzo, sitting in Part I, on February 13, 1992, and the following day the Second Circuit denied Fulani's application for an interim stay of the Debate pending appeal. The League-sponsored Debate was held on February 16, 1992.

Fulani contends that the harm to her caused by the certification by the United States government that her exclusion by the League was based on a nonpartisan and fair judgment that she was an insignificant candidate would have been eliminated. In Fulani's view, the IRS compounded the injury by explicitly stating in writing in a public document that it approved of the League's determination that Fulani's candidacy was insignificant.

Fulani also alleges that she continues to be injured by the policy of the IRS by which it permits tax exempt debate sponsors to select candidates. According to Fulani, the permitted use of subjective criteria to determine participation the debates makes it impossible for an insurgent or independent candidate to know what must be accomplished in order to qualify to participate in the debates. This has a chilling effect on supporters and allies of campaigns such as hers because the candidate cannot plan to meet objectives that should ensure inclusion in the debates sponsored by IRS-certified nonpartisan voter education organizations.

### Discussion

The League is exempt from federal income taxation pursuant to 26 U.S.C. § 501(c)(3) of the Internal Revenue Code. This section provides that a tax-exempt organization may not:

> participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

*Id.* The Treasure Department regulation addressing the application of this nonpartisanship requirement provides that:

> [a]ctivities which constitute participation or intervention in a political campaign on behalf of or in opposition to a candidate include, but are not limited to, the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate.

Treas.Reg. (26 C.F.R.) 1.501(c)(3)–1(c)(3)(iii). *See* Rev.Rul. 67–71, 1967–1 C.B. 125 (1967).

The regulations of the FEC, an independent federal agency, provide that nonpartisan candidate debates may be staged by (1) non-profit organizations that are exempt from federal taxation under § 501, (2) non-profit organizations that are exempt from federal taxation under 26 U.S.C. § 501(c)(4) and that do not "endorse, support or oppose political candidates or political parties," and (3) broadcasters, bona fide newspapers, magazines and other periodical publications. 11 C.F.R. § 110.13(a). The FEC regulations leave the structure of any such debates to the discretion of the staging organization "provided that (1) such debates include at least two candidates, and (2) such debates are nonpartisan in that they do not promote or advance one candidate over another." 11 C.F.R. § 110.-13(b).

Fulani alleges that she has been directly injured by the status and actions of the League as a tax exempt organization, and as such she has standing to bring an action against the government organs responsible for certifying the League's tax-exempt status and compel them to revoke that status.

### I. *Fulani Has Standing*

The Federal Defendants challenge Fulani's standing to bring this action in their motion to dismiss the Amended Complaint pursuant to Rule 12(b)(1) on the ground that this Court lacks jurisdiction over the subject matter of this action. In considering the issue of whether Fulani has standing to bring this action, it must be noted at the outset that this Court is not writing on a clean slate. In *Fulani II,* the Second Circuit held that Fulani did have standing to challenge the tax-exempt status of the League in her action against the League,

the Secretary of the Treasury, and the Commission of Internal Revenue. At issue in that action was Fulani's exclusion from the debates sponsored by the League during the 1988 presidential campaign.

In *Fulani III,* over the dissent of Chief Judge Mikva, the D.C.Circuit affirmed the trial court's dismissal of Fulani's complaint in which she challenged the tax-exempt status of the Commission for Presidential Debates. The D.C. Circuit summarized Fulani's allegations as follows:

> Fulani contends that she is injured by the fact that the CPD is engaging in a program of political misinformation, perpetuating *bi*partisan, rather than *non*partisan, political debates. This program ... advocates and perpetuates a two-party system, giving the false impression that there are only two legitimate candidates for presidential office.... [T]his misinformation program directly injured her by depriving her of the media coverage and political legitimacy necessary to her campaign[ and] violates § 501(c)(3)'s mandate that tax exempt organizations not engage in partisan political activities.

*Fulani III,* 935 F.2d at 1324.

The D.C. Circuit noted that third-party litigation of another's tax-exempt status is inconsistent with, if not precluded by, the statutory scheme created by Congress and rejected Fulani's assertion of "competitor standing" to challenge the CPD's tax-exempt status, *see id.* at 1327,[4] and concluded that "where a party is seeking simply to remove a third party's entitlement to a tax exemption, the exemption likely will not bear sufficient links of traceability and redressability to the alleged injury to warrant standing under *Allen....*" *Id.* at 1328.

The D.C. Circuit declined to follow the Second Circuit's reasoning in *Fulani II* on the ground that:

> the Second Circuit ignores the fact that the alleged traceability and redressability may be found in [*Fulani II*]—and could be found in the present case—only in combination with significant intervening causal factors[, including the FEC's regulations, the CPD's actions, and the anticipated behavior of other debate participants].

*Fulani III,* 935 F.2d at 1329.[5]

In the matter at hand, the Federal Defendants assert that the Second Circuit's holding in *Fulani II* cannot be followed here because the injury alleged here is "highly conjectural" in contrast to the "much more concrete and direct" injury alleged in *Fulani II.* Defs.' Mem. 17.

> Unlike *Fulani II,* plaintiffs here do *not* contend that the injury they have suffered is the media exposure Fulani did not receive because of her exclusion from the New Hampshire debate. The complaint makes clear that the alleged harm is the League's purportedly nonpartisan "imprimatur" of the significance of the candidates included in the debates, and the arguably implied message from the League that candidates who are not invited to the debate are not worthy of consideration by voters as potential Democratic nominees.

*Id.* at 12–13.

In deciding Fulani's motion for a preliminary injunction in the present action, Judge Sprizzo adopted the Federal Defendant's reasoning, distinguished the present action

---

**4.** *See also Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (securities brokers had standing to challenge ruling that national banks could act as discount brokers); *Investment Co. Inst. v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (open-end investment companies had standing to challenge ruling that banks could deal in collective investment funds); *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (data processing agency had standing to challenge rulings by

the Comptroller of the Currency allowing national banks to enter the data processing field).

**5.** The D.C.Circuit also noted the unique position of the CPD insofar as it "does not have the option of abandoning its tax-exempt statues; the CPD may sponsor the presidential debates only if it receives tax-exempt status from the IRS and is therefore not free, as were the hospitals in *Simon[ v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ], to continue its activities as a profit-funded organization." *Id.* at 1330.

# 1118

from that in *Fulani II,* and concluded that Fulani does not have standing:

> So I am left with the claim that the standing and/or irreparable injury ... consists of some competitive disadvantage that [Fulani] will suffer from the indirect endorsement of an educational nonpartisan organization of the five other candidates whom the [League] has invited to speak. I find that entirely too speculative and too insubstantial under the case law to confer standing upon her, even given the most generous reading of the Second Circuit's opinion in *Fulani II.* If I take that abortion rights case, ... I think that the holding there as to the lack of competitive injury sufficient to confer standing, ... makes it very clear that if that circumstance was not sufficient in that case, then it surely is not sufficient in this case.

Tr. 33. However, in light of the more substantial record on this motion than was before Judge Sprizzo, the Court respectfully declines to follow Judge Sprizzo's preliminary conclusions on the issue of standing and concludes that Fulani does satisfy the threshold requirement of standing to bring and maintain this action.

### A. *The Criteria for Standing*

It is well-established that "the burden is on the party claiming jurisdiction to demonstrate that the court has jurisdiction over the subject matter." *International Shipping Co., S.A. v. Hydra Offshore, Inc.,* 675 F.Supp. 146, 151 & n. 5 (S.D.N.Y.1987), *aff'd,* 875 F.2d 388 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). *See also McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Kheel v. Port of New York Authority,* 457 F.2d 46, 49 (2d Cir.), *cert. denied,* 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972).

Standing is an essential element of subject matter jurisdiction, and the question presented is whether this action should be dismissed for lack of subject matter jurisdiction because Fulani does not have standing to bring it.

The fundamental principles governing whether a plaintiff has standing to maintain an action in federal court are straightforward and familiar. A plaintiff must "allege[ ] such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial power on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (internal quotation omitted). The "core component" of standing, derived directly from the "cases of controversies" requirement of Article III of the Constitution, requires the plaintiff to "allege personal injury *fairly traceable* to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (emphasis added). The alleged injury cannot be "abstract" in character, *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); it must be "distinct and palpable," *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (internal quotation omitted). The Supreme Court has explained that the requirements for standing arise out of a "single basic idea—the idea of separation of powers," *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325, because they demarcate fundamental limits on the role of the federal courts in our tripartite system of government.[6]

The Second Circuit has prescribed the following test to determine whether plain-

---

**6.** In addition to these constitutional requirement, the Supreme Court has also recognized that the standing doctrine embraces certain prudential limitations on the exercise of federal jurisdiction, including "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. The Supreme Court has summarized this aspect of the standing inquiry as "[e]ssentially, ... wheth-er the constitutional or statutory provisions on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth,* 422 U.S. at 500, 95 S.Ct. at 2206 (footnote omitted). In short, a federal court "is not the proper forum to press general complaints about the way in which government goes about its business." *Allen,* 468 U.S. at 760, 104 S.Ct. at 3329 (citation and internal quotation omitted).

tiffs have the requisite standing, noting that, while it is "[d]eceptively simple to state, standing entails a complex three-pronged inquiry":

First, plaintiffs must show that they have suffered an injury in fact that is both concrete in nature and particularized to them. Second, the injury must be fairly traceable to defendants' conduct. Third, the injury must be redressable by removal of defendants' conduct. The second and third prongs—traceability and redressability—often dovetail; essentially, both seek a causal nexus between the plaintiff's injury and the defendant's assertedly unlawful act. To establish standing, a plaintiff must plead all three elements.

*In re United States Catholic Conference,* 885 F.2d 1020, 2034–24 (2d Cir.1989).

In *Fulani II,* the Second Circuit adopted the Supreme Court's approach in *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325, and translated the concepts underlying the three-pronged test into three questions it suggested the trial court keep in mind while conducting its standing inquiry:

Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and inquiry too attenuated? (And) is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?

882 F.2d at 624 (internal quotation omitted).

Before turning to Fulani's allegations and subjecting them to the three-part inquiry, the nature of those allegations makes it is important to note that the Supreme Court and lower courts have routinely rejected attempts by plaintiffs to challenge the tax-exempt status of third parties. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 42–43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976) (indigent plaintiffs held to lack standing in an action challenging the IRS ruling which allowed nonprofit hospitals to qualify as § 501(c)(3) charitable organizations even when they provided only emergency room services to the indigent); *Allen,* 468 U.S. at 754, 104 S.Ct. at 3326 (black parents held to lack standing to challenge the tax-exempt status of discriminatory private schools); *American Soc'y of Travel Agents, Inc. v. Blumenthal,* 566 F.2d 145 (D.C.Cir.1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978) (travel agents' challenge of favorable tax treatment of religious groups that conducted charter tours was too speculative to confer standing); *Catholic Conference,* 885 F.2d at 1020 (action by pro-choice abortion rights supporters challenging the tax-exempt status of the Catholic Church dismissed for failure to allege injury in fact and because pro-choice organizations were not competitors of the Catholic Church). However, these cases are distinguishable from the case at hand because Fulani's alleged injury satisfies the standing criteria as being "judicially cognizable," "fairly traceable," and "redressable".

As Fulani points out, the courts have also recognized a plaintiff's standing to bring an action when it is alleged that unconstitutional conduct by government officials creates or supports structural inequalities in the electoral system. In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court phrased the "gist of the question of standing" as: "Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?" *Id.* at 203, 82 S.Ct. at 702. There, the plaintiff voters alleged that by failing since 1901 to redraw election districts lines to correspond fairly to population changes, the State of Tennessee had perpetuated a structural inequality in the electoral process. The Supreme Court rejected the defendants' argument that the plaintiffs had not sustained a legally cognizable injury and therefore lacked standing to challenge the constitutionality of the district lines. The Supreme Court did not require the plaintiffs to prove or even allege that if the federal courts reapportioned the election districts, the plaintiffs

would achieve any specific results in the ensuing election contests. Rather, because the voters' injury was defined in terms of the structural inequality of the system, namely, being placed "in a position of constitutionally unjustifiable inequality *vis-a-vis* voters in irrationally favored counties," *id.* at 207–08, 82 S.Ct. at 704–05, the Supreme Court concluded that they were "entitled to a hearing and to the District Court's decision on their claims," *id.* at 208, 82 S.Ct. at 705.

Fulani also relies on *Smith v. Meese*, 821 F.2d 1484 (11th Cir.1987), for the proposition that, while the injury of structural inequality is "not always easy to establish," it is palpable and cognizable for standing purposes, "especially in light of the importance of the vote in our political system." *Id.* at 1494. In *Meese*, the plaintiffs asserted a claim that the Justice Department was engaging in a policy of ignoring complaints about unlawful electoral conduct by white public officials but initiating major investigations of offenses allegedly committed by African–Americans. The Eleventh Circuit held that the alleged injury—"the chilling of plaintiffs' right to vote," was concrete enough to satisfy the first prong of *Id.* The Eleventh Circuit distinguished the holding in *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), where the Supreme Court said: "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *id.* at 13–14, 92 S.Ct. at 2325–26, from the allegations in the matter before it on the ground that the latter constituted "an attack by a group of people on a specifically articulated discriminatory governmental policy which has already had the demonstrable objective effect of limiting, or chilling, the exercise of protected constitutional rights." *Meese*, 821 F.2d at 1494.

It is concluded from the analysis below that the standing issue in this case falls within the ambit of *Baker* and *Meese*, and that by "tilting the electoral playing field" against Fulani, *Fulani III*, 935 F.2d at 1337 (Mikva, C.J., dissenting), the League and the Federal Defendants have injured Fulani in such a manner that she qualifies for standing under *Allen* and *Catholic Conference*.

### B. *Applying the Criteria*

■ When Fulani's Amended Complaint is read in the most favorable light and all factual inferences are drawn in her favor, as they must be at this stage, *see Warth*, 422 U.S. at 501, 95 S.Ct. at 2206, the prohibited conduct challenged by Fulani is "the continued grant of a tax exemption by the IRS to an organization which allegedly engaged in 'partisan' activities, in contravention of § 501(c)(3)." *Fulani II*, 882 F.2d at 625. The result of this state of affairs is, in Fulani's view, that the government continues to support an unfair and partisan structure in the electoral process that works an injury on her.

#### 1. *Injury*

Fulani alleges that the actions of the League and the Federal Defendants have resulted in irreparable harm to her that are palpable and concrete in nature. Specifically, Fulani alleges that holding the Debate under the League's sponsorship created the misimpression that only those candidates invited to participate were "significant" and worthy of voter attention, given the criteria used by the League in deciding whom to include in and exclude from the Debate. Further, the "continuing recognition of the League's exemption as a purportedly nonpartisan voter education organization by the federal government gives an imprimatur of nonpartisan objectivity to the League's false and partisan assertion that Fulani is not a significant candidate." Am.Compl. ¶ 31. Finally, it is alleged that, by excluding Fulani from the Debate sponsored by the League, Fulani lost votes, monetary contributions, volunteer services, media exposure, and name recognition, and thus competitive advantages were conferred upon Fulani's rivals.

Of course, as Fulani readily conceded before Judge Sprizzo, if the League had withdrawn from sponsoring the Debate, CNN presumably would have gone forward

with it. Thus, the critical allegation against the League and the Federal Defendants is that Fulani was harmed by the League's sponsorship of the Debate because voters received a message that the nonpartisan, federally tax-exempt League determined that Fulani's candidacy did not warrant serious attention.

The injury alleged here is neither too speculative nor too insubstantial to confer standing upon Fulani. This conclusion is evidenced by the curious position in which the League has placed itself in supporting this motion. The League contends that its role in sponsoring presidential debates is of no real significance whatsoever and that there is no message conveyed to the voting public by its sponsorship of a particular debate. However, this position is the antithesis of the position the League has carved out for itself in the political arena. The League has heretofore appropriately held itself up as the protector of integrity and impartiality in the electoral process.

This is most obvious in the League's hostile response to the creation of the CPD by the Republican and Democratic parties. In a public statement and news release issued on October 3, 1988 by the League, Nancy Neuman, the League's president, noted the League's continuous objection to the CPD as an inappropriate sponsor of presidential debates and announced the withdrawal of the League as a cosponsor of the 1988 final presidential debate because "[t]he League has no intention of becoming an accessory to the hoodwinking of the American public." Newman Decl. Ex. C. The news release stated that "the League regretted that the American people have had no real opportunities outside of campaign-controlled environments," and that Neuman issued a final challenge to Vice President Bush and Governor Dukakis to "rise above your handlers and agree to join us in presenting the fair and full discussion the American public expects of a League of Women Voters debate." *Id.*

In support of the present motion, the League now contends that its participation in the sponsorship of a debate is of no significance to the voting public and now offers the self-serving statement that there is no perceptible difference between "the nonparticipation of a candidate in a Presidential primary debate cosponsored by an organization with tax-exempt status under section 501(c)(3) ... and a news media organization, on the one hand, and nonparticipation of a candidate in such a debate sponsored by a news media organization alone, on the other hand." Millman V.S. ¶ 8. This position directly contradicts the League's public claim that it is only the League's participation in a debate that assures the American electorate that it is not being duped by the proceedings. Therefore, in the League's own view, to participate as a candidate in a debate sponsored by it is to be given an imprimatur of legitimacy and seriousness that one would not otherwise have because the debate itself is legitimate and serious in character.

Additionally, the League's criteria for determining who is invited to participate in a League sponsored debate purports to certify the legitimacy of a candidate because only those judged to be "significant" are qualified to participate. This determination of a candidates' significance is purely subjective in nature and turns exclusively on the discretion of the League.

Therefore, assuming the truth of Fulani's allegations, the government is supporting an unfair and partisan structure in the electoral process by underwriting the League's discretionary ability to influence the electoral process as it arbitrarily excludes candidates from debates who otherwise meet the objective criteria to participate. The Second Circuit's conclusion in *Fulani II* and Chief Judge Mikva's conclusion in *Fulani III* are, then, applicable here:

> In our view, the loss of competitive advantage flowing from the League's exclusion of Fulani from the national debates constitutes sufficient "injury" for standing purposes, because such loss palpably impaired Fulani's ability to compete on an equal footing with other significant presidential candidates.

882 F.2d at 626. And,

> Dr. Fulani's core allegation is that she will be unlawfully burdened in seeking to

make her political message known, while the Democratic and Republican candidates for President would be advantaged in advancing their rival political views. Whatever the merits of Fulani's claim, it suggests restriction of "classically political speech," and so goes to the core of the First Amendment.

935 F.2d at 1333 (Mikva, C.J., dissenting) (citations omitted). *See also Association of the Bar of the City of New York v. Commissioner*, 858 F.2d 876, 879 (2d Cir. 1988), *cert. denied*, 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 204 (1989). Fulani's allegations satisfy the first prong of the *Allen* and *Catholic Conference* test.

### 2. *Traceability*

The Federal Defendants assert that Fulani has failed to satisfy the second prong of *Allen* because "the injury alleged to have been suffered by plaintiffs is too remote and speculative to be 'fairly traceable' to the tax-exempt status of the League." Defs.' Mem. 14. However, following the Second Circuit's reading of *Common Cause v. Bolger*, 512 F.Supp. 26, 32 (D.D.C. 1980) (three-judge court), *aff'd*, 461 U.S. 911, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983), in *Fulani II*, this Court similarly finds that the asserted harm flows from the League and Federal Defendants' allegedly partisan restriction of her opportunities to communicate her political ideas to the voting public at large through a forum having the imprimatur of a nonpartisan voter education organization. *See id.* at 627.

Further, there is an evident nexus between the Federal Defendants' tax treatment of the League and Fulani's alleged injury because if the League were not tax exempt under § 501(c)(3), it would have been prohibited by the FEC from sponsoring any debates.

> *But for* the government's refusal to revoke the League's tax-exempt status, then, the League, as a practical matter, would have been unable to sponsor the allegedly partisan debates which caused the injury of which Fulani complains.

*Id.* at 628. Thus, on the facts alleged by Fulani, her judicially cognizable injury is one which satisfies *Allen*'s second prong because it is "fairly traceable" to her exclusion from the League-sponsored debate. *See Fulani III*, 935 F.2d at 1334 (Mikva, C.J., dissenting) (establishing a causal nexus between the CPD's tax exemption and Fulani's injury does not require the guesswork in *Allen*); *Fulani II*, 882 F.2d at 628 (distinguishing *Simon* on the ground that, here, "the causal chain is more clearly drawn because in practice the interlocking frameworks of Internal Revenue Code provisions and FEC regulations severely narrow the League's latitude of discretion").

### 3. *Redressability*

The Federal Defendants contend that because the debate could have gone forward under CNN's sole sponsorship, Fulani cannot establish that her injury would be redressed by the relief of revoking the League's tax-exempt status. *See Fulani III*, 935 F.2d at 1328 (Mikva, C.J., dissenting) ("where a party is seeking simply to remove a third party's entitlement to a tax exemption, the exemption likely will not bear sufficient links of traceability and redressability to the alleged injury to warrant standing under *Allen*"). However, this contention misses the gravamen of Fulani's allegations: If the League were not a sponsor of the debate, regardless of what CNN subsequently did, there would no longer be a debate from which Fulani was excluded that was sponsored by a § 501(c)(3) tax-exempt organization.

Therefore,

> Fulani's asserted injuries could have been redressed by the relief sought, since, practically speaking, revocation of the League's tax-exempt status at least would have prevented the League's sponsorship of the [D]ebate[ ], from which Fulani claims she was wrongfully excluded. This being so, Fulani has met the third part of the standing test.

*Fulani II*, 882 F.2d at 628. *See also Fulani III*, 935 F.2d at 1335 (Mikva, C.J., dissenting) ("Fulani's injury would be redressed by any lawful response at all.").

### C. *Competitive Advocate Standing*

■ The Federal Defendants also contend that Fulani lacks "competitive advo-

cate standing" as defined by the Second Circuit in *Catholic Conference*, 885 F.2d at 1028. There, the Second Circuit stated the rule that to demonstrate an injury as a competitor "a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." *Id.* at 1029. Applying this rule to the facts at hand, the Federal Defendants conclude that, because Fulani asserts a competitive disadvantage to her campaign flowing from the tax-exempt status of an organization rather than a rival candidate, Fulani cannot satisfy the competitive advocate standing test. *See id.* at 1029–30 (holding that "pro-choice" organizations were not competitors of the Catholic church because they chose not to match the Church's alleged electioneering).

However, competitive advocate standing as considered in *Catholic Conference* is based on competition "in the same arena," *Id.* at 1029, and there is no requirement that a plaintiff compete *in that arena* with a similarly composed and situated organization using exactly the same methods. In the Federal Defendants' view, if the League were directly soliciting contributions and using the funds to purchase television advertising time for the presidential campaigns of various Fulani rivals, the League would not be competing with Fulani and her own fund raising organization. This conclusion is not consistent with the reasoning of either *Catholic Conference* or *Allen.*

One element of Fulani's claim is that the League is using funds that it has raised through its § 501(c)(3) status to obtain television exposure for Fulani's competitors. Therefore, under *Catholic Conference*, Fulani has made a prima facie showing that she personally competes in the same arena

with the League, the party to whom the government has bestowed the assertedly illegal benefit.[7]

### D. *Conclusion*

Fulani has satisfied both the three-pronged standing test of *Allen* and *Catholic Conference* and *Catholic Conference*'s competitive advocate standing test. Therefore, she has standing to bring this action against the Federal Defendants and the League.

### II. *Fulani Has Not Stated a Claim for Which Relief Can Be Granted*

### A. *Rule 12(b)(6)*

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from Fulani's Amended Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motions.

Rule 12(b)(6) also imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). *Accord Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984) (quoted in

---

**7.** The Supreme Court has held that a third party can have standing to challenge a law granting a tax exemption to an indirect competitor. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 8, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989) (publisher of general interest magazine had standing to bring action challenging statute exempting religious periodicals from paying sales and use taxes); *see also Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir.1990) (standing for presidential candidate who was on ballot to challenge placement of competitors on the ballot), *cert. denied,* —— U.S. ——, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991); *Common Cause,* 512 F.Supp. at 29–30 (candidate standing to challenge a franking statute benefitting competitors); *Greenberg v. Bolger,* 497 F.Supp. 756 (E.D.N.Y.1980) (parties and candidates have standing to challenge federal statute granting preferential rates to competitors).

*H.J., Inc. v. Northwestern Bell Tel. Co.,*
492 U.S. 229, 250–51, 109 S.Ct. 2893, 2906,
106 L.Ed.2d 195 (1989)).

### B. The Framework of "Fulani II"

In *Fulani II,* the Second Circuit held that
Fulani had standing but failed to state a
claim for which relief could be granted and
affirmed this Court's order denying Fula-
ni's motion to compel the revocation of the
League's tax-exempt status. That holding
turned on the fact that the debates at issue
were *"primary season* debates" and not
*"general election* debates". The Second
Circuit reasoned that:

> [p]rimary contests ... are essentially *in-
> tra-party* competitions. Although such
> candidates are members of the same par-
> ty, each may have a separate political
> agenda for the party's future and they
> present themselves to those who are eli-
> gible to vote in the primary as the candi-
> date who will best represent the party in
> the general election.

882 F.2d at 629. Thus, as a "significant"
independent candidate, Fulani "miscast the
purpose of the primary phase of national
elections" in her action against the League
because she "sought to compel the League
to convert its 'primary season' voter edu-
cation program into a 'general election' pro-
gram for educating voters about *inter-par-
ty* differences." *Id.* at 630.

The present action is distinguishable
from *Fulani II* because Fulani had filed as
a candidate for the Democratic party's
presidential nomination and the debate

from which she was excluded was a Demo-
cratic party presidential primary debate.[8]
Thus, the unique question presented by
Fulani's current allegations in the Amend-
ed Complaint is whether the League could
act consistently with its tax-exempt status
and exclude a candidate for a party's nomi-
nation from a televised public debate of
that party's candidates, which was being
cosponsored by the League, when that can-
didate satisfied all of the League's objec-
tive criteria as a qualified participant but
allegedly failed to met the League's subjec-
tive standard of "significant candidate".

For the reasons set forth below, it is held
that, while Fulani has otherwise stated a
claim that withstands the Federal Defen-
dants' motion Rule 12(b)(6) motion to dis-
miss, the relief she seeks to remedy her
alleged injury is inappropriate and cannot
be granted by this Court. To the extent
that Fulani has alleged that the League
engaged in just such partisan promotion of
candidates within the Democratic party's
New Hampshire primary process in its ex-
clusion of her from the Debate, she has
stated a valid claim. However, this Court
cannot grant the injunctive relief against
the Federal Defendants which Fulani pres-
ently seeks. Therefore, the Federal Defen-
dants' motion must be granted.

### C. Fulani's Allegations

#### 1. The League's Violations of § 501(c)(3)

■ Fulani alleges three distinct ways in
which the League violated the anti-election-
eering provisions of § 501(c)(3)[9]: first, the

---

**8.** The Federal Defendants contend that, because
Fulani did not notify the FEC in her original
application for matching funds that she was
entering any Democratic primaries, nothing she
could do thereafter could transform her into a
legitimate candidate for the Democratic party
nomination. However, reporting to the FEC
about what primaries a presidential candidate is
entering is merely a routine notification that
enables the FEC to monitor the requirements
for continued eligibility for matching funds. A
candidate who has qualified for matching funds
will lose her matching-funds eligibility if she
does not receive certain threshold levels of votes
in primary contests in which she is on the
ballot, except for contests in which the candi-
date has made a timely declaration that she will
not be an active candidate in a particular pri-
mary. *See* 11 C.F.R. § 9033.5. Therefore, the

Federal Defendants fail to establish that Fulani
was not a legitimate candidate for the Demo-
cratic party nomination at the time of the
League-sponsored debate in New Hampshire.

**9.** *See* IRS Reg. § 1–501(c)(3)–1 (the "operational
test" provides that an organization will not be
considered to be operated exclusively for one or
more exempt purposes if it is an "action" orga-
nization, i.e., if it participates or intervenes,
directly or indirectly, in any political campaign
on behalf of or in opposition to any candidate
for public office); *see also Fulani II,* 882 F.2d at
624 ("the organization must remain strictly
'nonpartisan' in its endeavors"); *Association of
the Bar,* 858 F.2d at 879–80 (discussing 1987
amendment of § 501(c)(3) which band partic-
ipation both "on behalf of" and "in opposition

League's use of subjective Selection Criteria to exclude Fulani from the debate violated the objectivity requirements of *Association of the Bar;* second, the League's decision to exclude Fulani violated the significance requirements of *Fulani II;* and third, the League conspired with the Democratic party to oppose Fulani's insurgent candidacy. Each allegation is considered in turn below.

a. The Subjective Selection Criteria

In *Association of the Bar,* the Association for the Bar for the City of New York ("ABCNY") brought an action for a declaratory judgment, seeking a determination that it qualified for an exemption from federal income tax under § 501(c)(3). Reversing the Tax Court below, the Second Circuit held that even if the tax exempt organization acts with the best intentions, any activity that amounts to an intervention into electoral process is strictly prohibited. *See* 858 F.2d at 881–82. In applying this rule to the ABCNY's program of evaluating the qualifications of candidates for elected judicial and law enforcement positions, the Second Circuit held that ABCNY failed to qualify for an exemption under § 501(c)(3), despite the fact that providing such information to the public fulfilled an ethical duty of the legal profession. *See id.* at 878, 882; *see also Fulani II,* 882 F.2d at 624 (citing Rev.Rul. 78–248, 1978–1 C.B. 154).

The Second Circuit found that ABCNY's subjective expressions of its opinions regarding the qualifications of candidates failed to meet the requirements imposed on tax exempt organizations under § 501(c)(3) and held that ABCNY "falls clearly within the definition of 'action' organization...." *Association of the Bar,* 858 F.2d at 881; *see also id.* at 880 (detailed discussion of what constitutes objective data as opposed to subjective opinions).

Fulani alleges that she "satisfied all elements of the League's criteria that could lawfully be applied by a nonpartisan voter education organization to judge the significance of a candidate for the Democratic party nomination in the 1992 New Hampshire Primary," Am.Compl. ¶ 25, in other words, all of the criteria that were objective in nature. The League justified its decision to exclude Fulani on the fourth of the Selection Criteria ("Criterion 4"): "The candidate must be a significant candidate for the Democratic party nomination." J.A. 45. This criterion, Fulani asserts, is facially violative of the anti-electioneering provisions because it fails the objectivity test of § 501(c)(3) set forth in *Association of the Bar.*

Additionally, the Selection Criteria list various factors that may be considered in applying Criterion 4 to a particular candidate. However, these factors only serve to reinforce the subjectivity of the League's analysis under this criterion. The League gives itself a general loophole for subjectivity by stating that it "may consider such other facts that in the League's *good faith judgment* may provide substantive evidence of nationwide voter interest...." J.A. 46 (emphasis added).

The League may also consider "recognition by the national media as a candidate meriting media attention." *Id.* This factor is vague on its face, which necessarily requires a subjective interpretation to made in its application. *See LaRouche v. Kezer,* 787 F.Supp. 298, 300 (D.Conn.1992) (holding that a similar formulation in Connecticut's election laws was unconstitutional). It is also subjective because it incorporates by reference the subjective judgments of news organizations.

A further factor in Criterion 4 is "active campaigning in a number of states for the Democratic Party's nomination." J.A. 46. The objective component of quantifying the number of states in which a candidate is campaigning is sharply tempered by the subjective aspect of defining what constitutes "active campaigning". Fulani alleges that this is evident in the League's assessment of her campaign. At the time of the

to" candidates for public office); H.R.Rep. No. 413, 91st Cong., 1st Sess. 31–34; S.Rep. No. 522, 91st Cong., 1st Sess. 46–49 (interpreting

§ 501(c)(3) to mean that "no degree of support for an individual's candidacy for public office is permitted").

Debate, more Americans had contributed to her campaign than to that of any other Democratic party candidate, and she had been compaigning nationally during the previous ten months. However, the League chose to disregard Fulani's campaigning and fund raising prior to her filing as a candidate for the Democratic party nomination.

The last of the factors to consider in applying Criterion 4 is "eligibility for matching payments". J.A. 45. This is an objective requirement, and Fulani clearly fulfilled it because she was the first presidential candidate to qualify for matching funds and had raised as much or more than three of the five candidates the League invited to participate in the Debate.

The Federal Defendants' attempt to distinguish *Association of the Bar* from this case, on the ground that the League did not rate or endorse candidates but "merely sponsored a forum in which the candidates could express their positions," Defs.' Mem. 23, necessarily fails because what is at issue is the methodologies used by tax-exempt organizations as they act in the political arena rather than the precise nature of their activities. Thus, the League's methodology for excluding Fulani from the Debate by relying on Criterion 4 parallels the subjective methodology employed by ABCNY.

### b. The "Significance" Criterion of "Fulani II"

Fulani alleges that even if Criterion 4 did not violate the objectivity test of *Association of the Bar*, the League's decision to exclude her violated the "significance" requirements of *Fulani II*. In *Fulani II*, the Second Circuit discussed at length the role of the primary debates for the Republican and Democratic parties. *See* 882 F.2d at 629. The Court noted that the League historically has sponsored primary debates "in an effort to educate voters about relevant issues and about candidates seeking to become party nominees" by bringing together in separate fora "the significant candidates" for each party's nomination. *Id.*

In light of this statement of the purpose of the primary debates, Fulani alleges that she was both a significant candidate and that her campaign focused on relevant issues about which the electorate should have been informed. She contends that at the time of the Debate none of the invited candidates was addressing the issues of racial justice, poverty, homelessness, the AIDS crisis, police brutality, urban decay, and the deportation of Haitian refugees.

### c. The League's Alleged Complicity

In Count Two of the Amended Complaint, Fulani alleges that the League acted in coordination with "a concerted campaign by Democratic Party officials ... to oppose Fulani's insurgent Democratic Party candidacy." Am.Compl. ¶ 54. Fulani contends that the League fell in line with the aggressively partisan conduct of the Democratic party leaders; with the major party bias of the League's commercial cosponsor, CNN; and/or with the biases of members of the League's own Executive Board who are allegedly opposed to the establishment of significant independent parties in the United States that could challenge the existing two-party system.

In response to these allegations, the Defendants offer the Verified Statement of Gracia Hillman, Executive Director of the League, in which she says that "the League and the Executive Committee of its Board of Trustees did not consult with the Democratic party or in any way defer to the views of the Democratic party or any other entity." Hillman V.S. ¶ 7.

The allegations of Count Two state a claim that withstands the present motion to dismiss, and a genuine issue exists as the possibility of whether any outside forces or factors influenced the League in its decision to exclude Fulani from the Debate.

### 2. *Fulani's First Amendment Claim*

■ "[T]he prohibition on political campaign activities [in § 501(c)(3)] ... reflect[s] Congressional policies that the U.S. Treasury should be neutral in political affairs." H.R.Rep. No. 391, 100th Cong., 1st Sess. 1621, 1625 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–1201, 2313–1205. *See Fulani II*, 882

F.2d at 629; *Association of the Bar*, 858 F.2d at 879–80. This Congressional policy is grounded in the First Amendment. As Chief Judge Mikva stated in *Fulani III*, "[t]he government of any democracy, let alone one shared by the values of our Constitution's First Amendment, must avoid tilting the electoral playing field, lest the democracy itself becomes tarnished." 935 F.2d at 1337 (Mikva, C.J., dissenting).

Fulani alleges that the Federal Defendants' nonenforcement of the anti-electioneering provisions of § 501(c)(3) against the League constitutes a "tilting of the electoral playing field" in violation of Fulani's First Amendment rights. She asserts that the Federal Defendants have a duty to revoke the tax-exempt status of any § 501(c)(3) organizations that succumb to the partisan pressure of the "official" candidates, Democratic and Republican party organizations, and the national networks.

While this Court rejected Fulani's First Amendment claim in *Fulani I*, the claim stated here is distinguishable from that previous claim. The gist of the First Amendment claim in *Fulani I* was that Fulani's First Amendment rights were violated simply by her exclusion from presidential primary debates as an independent minor party candidate. Relying on various authorities, this Court rejected that claim, noting that neither Fulani nor any other minor party candidate has a First Amendment right to participate the League-sponsored debates. *See Fulani I*, 684 F.Supp. at 1192 n. 4; *see, e.g., Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (no individual member of the public has a right to broadcast her own particular views on any matter); *Johnson v. Federal Communications Comm'n*, 829 F.2d 157, 160 (D.C.Cir.1987) (minor party candidates have no right under First Amendment or Communications Act of 1934 to be included in debates).

In the matter at hand, Fulani is not asserting that the First Amendment guaranteed her a right to participate in the Debate. Rather, her claim is that the partisan activities of the League in the nature and application of its Selection Criteria for the Debate, and of the Federal Defendants in allowing the League to act in a partisan manner while benefitting from § 501(c)(3) tax-exempt status, removed the vital element of governmental neutrality from the New Hampshire Democratic party primary process, and it is Fulani's First Amendment rights which are encroached upon by this loss of neutrality.[10] Thus, the First Amendment claim asserted here is distinguishable from those rejected in the past.[11]

D. *The Relief Sought Cannot Be Granted*

■ The Federal Defendants correctly contend that their Rule 12(b)(6) motion should be granted on the ground that the relief sought by Fulani may not be granted by this Court. This conclusions follows from the fact that Fulani's action has the character of mandamus, and a writ of mandamus is inappropriate when a plaintiff seeks to direct or influence the absolute discretion of a government agency. *See Flynn v. Shultz*, 748 F.2d 1186, 1194 (7th Cir.1984) (citing *Interstate Commerce Comm. v. Humboldt Steamship*, 224 U.S. 474, 484, 32 S.Ct. 556, 559, 56 L.Ed. 849 (1912)), *cert. denied*, 474 U.S. 830, 106 S.Ct. 94, 88 L.Ed.2d 77 (1985); *see also Rizzo v. Terenzi*, 619 F.Supp. 1186, 1189 (E.D.N.Y. 1985) (action to compel officer of the United States to perform a duty constitutes request for mandamus). In light of the fact that the Federal Defendants have "very broad authority" to interpret and administer the tax laws, *Bob Jones University v. United States*, 461 U.S. 574, 596–97,

---

**10.** This statement of Fulani's First Amendment claim also serves as a gloss of the Chief Judge Mikva's comment in *Fulani III* quoted above. *See also Fulani II*, 882 F.2d at 625 (Judge Pierce's summary of Fulani's claim).

**11.** Fulani also asserts a Fifth Amendment claim against the Defendants, based on the provision

that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." However, on the present record, Fulani has failed to establish a colorable Fifth Amendment claim.

103 S.Ct. 2017, 2031, 76 L.Ed.2d 157 (1983), the present action is not the proper subject matter for mandamus. *See Sprecher v. Graber,* 716 F.2d 968 (2d Cir.1983) (mandamus inappropriate to compel Security and Exchange Commission to take enforcement action).

Fulani responds to this characterization of her action and proposed relief by contending that the mandamus test "is irrelevant, because Fulani's claim is not that the IRS failed to perform a ministerial duty, but rather that it exercised its discretion in a politically partisan manner." Fulani Mem. 33. However, this alleged distinction does not warrant this Court to grant the relief Fulani seeks. The fact remains that Fulani is requesting this Court order the Federal Defendants to act in a particular manner that falls within the scope of its discretionary authority, and as such, it constitutes a request for a writ of mandamus. But as was noted above, mandamus is not appropriate in this situation.

The posture of *Association of the Bar* is instructive on this point. There, ABCNY appealed the decision of the Commissioner of Internal Revenue denying ABCNY § 501(c)(3) status in the United States Tax Court. The Tax Court held that the ABCNY qualified for tax-exempt status and ordered the Commissioner to certify it as a tax exempt organization, *see Association of the Bar of City of New York v. Commissioner of Internal Revenue,* 89 T.C. 599, 611 (1987), and it was this holding that was reversed by the Second Circuit in *Association of the Bar,* 858 F.2d at 876. It is the Tax Court, not this Court, that has the appropriate jurisdictional authority to order the IRS to exercise its otherwise discretionary power in one way or another.

This Court has the authority to issue a declaratory judgment regarding Fulani's rights, and Fulani's rights have been explicated in the course of this discussion. However, Fulani has failed to offer any authority to support her claim that it is within the jurisdiction of this Court to take the further step of ordering the Federal Defendants to revoke the League's tax-exempt status. Therefore, Fulani has not stated a claim for which the requested injunctive relief is an appropriate remedy because the remedy cannot be granted by this Court.

*Conclusion*

For the reasons set forth above, the Federal Defendants' 12(b)(1) motion for an order dismissing Fulani's Amended Complaint for lack of subject matter jurisdiction is denied, and their 12(b)(6) motion to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted is granted.

It is so ordered.